UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BARBARA J. RENNEKER,                          Case No. 1:10-cv-386
    Plaintiff                                 Beckwith, J.
                                              Litkovitz, M.J.
    vs

MICHAEL J. ASTRUE,                            **REPORT AND**
COMMISSIONER OF                               **RECOMMENDATION**[1]
SOCIAL SECURITY,

    Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement

of Specific Errors (Doc. 11), the Commissioner's Memorandum in Opposition. (Doc. 12) and

plaintiff's Reply. (Doc. 13).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1974 and was 35 years old at the time of the administrative law

judge's (ALJ) decision. (Tr. 24). She attended school through eighth grade and later obtained a

G.E.D. (Tr. 25). She has past work experience in housekeeping and the food-service industry.

(Tr. 27-8). Plaintiff filed an SSI application on December 13, 2006, alleging a disability onset

date of January 1, 2003, due to mental issues, anxiety, panic attacks and heart murmur. (Tr. 99-

102, 134). The application was denied initially and upon reconsideration. Plaintiff then

requested and was granted a de novo hearing before ALJ Larry A. Temin.  (Tr. 59).  On July 20,

2009, plaintiff, who was represented by counsel, appeared and testified at the hearing.  (Tr. 22-

44).  A vocational expert (VE), Dr. Donald Shry, also appeared and testified at the hearing.  (Tr.

44-48).

On October 7, 2009, the ALJ issued a decision denying plaintiff's SSI application.  (Tr.

9-16).  The ALJ determined that plaintiff suffers from the following severe impairments: an

affective disorder, an anxiety disorder, a borderline personality disorder, and alcohol

dependence.  (Tr. 11).  The ALJ found that these severe impairments, considered singly and in

combination, did not meet or equal the level of severity described in sections 12.04, 12.06, 12.08,

or 12.09 of the Listing of Impairments ("Listings"), or any other section of the Listings.  (Tr. 12).

The ALJ determined that plaintiff retains the residual functional capacity (RFC) to

perform a full range of work at any exertional level, with the following limitations:

> The claimant is able to remember and carry out only short and
> simple instructions.  She cannot interact with the general public, or
> interact more than occasionally with coworkers or supervisors.
> The claimant cannot work at a rapid production-rate pace, or
> perform a job that requires a strict production quota.  Her job
> should not require more than ordinary and routine changes in work
> setting or duties, or more than simple work-related decisions.

(Tr. 12).  The ALJ found that plaintiff's medically determinable impairments could reasonably

be expected to produce some of her alleged symptoms, but that plaintiff's statements concerning

the intensity, persistence, and limiting effects of these symptoms are not credible to the extent

they are inconsistent with the RFC assessment.  (Tr. 13).  The ALJ determined that the plaintiff

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

was unable to do her past relevant work. (Tr. 15). However, based on the VE's testimony, the ALJ determined that jobs exist in significant numbers in the national economy, such as light unskilled machine tender, laundry aide, gluer, and envelope sealer, that plaintiff could perform given her RFC to perform unskilled work at any exertional level. (Tr. 16). Consequently, the ALJ concluded that plaintiff is not disabled under the Social Security Act and therefore not entitled to SSI. *Id.*

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner. (Tr. 1-4).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. §

416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 416.920. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 416.920(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461

4

U.S. 957 (1983).

A mental impairment may constitute a disability within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  However, the mere presence of a mental impairment does not establish entitlement to disability benefits.  In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings.  20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments.  Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure.  20 C.F.R. §§ 404.1520a and 416.920a.  A standard review technique is completed at each level of administrative review for mental impairments.  *Id*.

This special procedure requires a rating of the degree of functional loss resulting from the impairment.  20 C.F.R. § 404.1520a(c)(3).  Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation.  *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993) (per curiam).  The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: none, mild, moderate, marked, and extreme.  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more.  The last point on each scale represents a degree of limitation that is

5

incompatible with the ability to do *any* gainful activity. 20 C.F.R. § 404.1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. 20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. The Listings for mental disorders, with the exception of Listings 12.05 (mental retardation and autism) and 12.09 (substance addiction disorders), contain two parts, referred to as the Part A criteria and the Part B criteria. The Part A criteria consists of clinical findings which medically substantiate the presence of a mental disorder. One or more of the Part A criteria must be met. The Part B criteria consist of a list of functional restrictions which are associated with mental disorders and are incompatible with the ability to work. Two or three of the Part B criteria must be met. Listing 12.06 also contains a third element, the Part C criteria, which consist of additional functional considerations. In order to qualify under the Listings for mental disorders, the functional restrictions described in the Parts B and C criteria must be the result of the mental disorder demonstrated by the clinical findings of Part A. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A). Listing 12.09 for substance abuse disorders is structured differently. It is essentially a reference listing in that it indicates certain other Listings that are to be used in evaluating the behavioral and physical changes that may result from the regular use of addictive substances. *Id.*

If a mental impairment does not meet or equal a listed mental disorder, the Commissioner must then assess plaintiff's mental residual functional capacity. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the

6

individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Sec'y of H.H.S.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Sec'y of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Sec'y of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Sec'y of H.H.S.*, 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson*, 735 F.2d at 964 (emphasis in original); *O'Banner,* 587 F.2d at 323. Taking notice

7

of job availability and requirements is disfavored. *Kirk*, 667 F.2d at 536-37 n.7, 540 n.9. There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips* v. *Harris*, 488 F. Supp. 1161 (W.D. Va. 1980) (citing *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born*, 923 F.2d at 1174; *Varley* v. *Sec'y of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

Lastly, a second-level review of the ALJ's decision may result in overturning the finding even where substantial evidence supports the determination. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id*. at 651 (internal quotations omitted).

## MEDICAL RECORD

The record contains plaintiff's medical treatment history from 2005 to 2009.[2] (Tr. 177-434). In March of 2005, plaintiff sought treatment for a racing heart beat at the Fort Hamilton

---

[2] The record includes extraneous medical documents, *e.g.*, treatment for possible mold exposure. (Tr. 223). The Court will only discuss the portions of the record pertaining to plaintiff's disability claim.

Hospital emergency room. (Tr. 231-33). She was directed to follow up with her primary doctor for thyroid testing and for anxiety and panic evaluations. (Tr. 232). In May of 2005, plaintiff went back to the Fort Hamilton Hospital emergency room with complaints of nausea, shaking and increased heart rate. (Tr. 228-30). Plaintiff reported that she believed the symptoms were caused by a dose of Lexapro she had taken that morning, but that she took an Ativan and felt fine afterwards. (Tr. 228). Plaintiff was diagnosed with medication side effect and anxiety and was directed to follow up with her primary doctor about switching medications. (Tr. 229-30).

On June 17, 2005, plaintiff was again treated at the Fort Hamilton Hospital emergency room for an anxiety attack. (Tr. 225-27). She reported a racing heart and stated she felt like she was "going crazy." (Tr. 225). She also stated she had recently run out of her Ativan prescription. *Id*. Plaintiff reported she did not use alcohol or illicit drugs. *Id*. She was given Ativan at the emergency room, diagnosed with an anxiety attack, and received a prescription for Ativan with instructions to seek follow-up care. (Tr. 226-27).

In October of 2005, plaintiff returned to Fort Hamilton Hospital complaining of dizziness and a panic attack. (Tr. 219-21). She stated that she ran out of her Ativan prescription a month ago which exacerbated or precipitated the panic attack. (Tr. 219). She was diagnosed with panic attack and given Xanax. (Tr. 221).

In January of 2006, plaintiff again sought treatment at the Fort Hamilton Hospital for anxiety attacks. (Tr. 213-15). She reported that she had taken Ativan and Xanax previously for anxiety, and that her anxiety attacks usually resolve within three hours. (Tr. 213). Plaintiff was

9

diagnosed with anxiety and was given Ativan and a refillable prescription for Xanax. (Tr. 214-15). She was referred for follow up treatment with Rajesh Khanna, M.D. (Tr. 215).

On May 2, 2006, plaintiff went to Fort Hamilton Hospital reporting anxiety, depression and suicidal thoughts. (Tr. 204-06). She stated that she had not taken psychiatric medications for over a year, and denied using alcohol or illicit drugs. (Tr. 204). The plaintiff was transferred to the psychiatric facility at Christ Hospital where she reported increased anxiety and severe headaches, but denied suicidal ideation. (Tr. 177-181). Plaintiff stated that she had no prior diagnosis and had never seen a psychiatrist and, further, had no prior inpatient or outpatient treatment. (Tr. 177). She reported that she had recently been using alcohol heavily and had a history of benzodiazepine abuse, but was not currently taking any. (Tr. 178). She was diagnosed by Marta Pisarska, M.D., with mood disorder, "rule out panic disorder," history of sedative dependence, and chronic headaches and was assigned a GAF[3] score of 35. *Id.* She was prescribed Lamictal and Seroquel for her anxiety and discharged on May 4, 2006. *Id.*

On June 15, 2006, plaintiff went to the Fort Hamilton Hospital emergency room for complaints of chest pain. (Tr. 198-200). She reported that she has frequent panic attacks but had not taken medication for a long time. (Tr. 198). She was diagnosed with anxiety and prescribed Ativan. (Tr. 199). On July 18, 2006, plaintiff returned to the Fort Hamilton Hospital emergency room complaining of anxiety and panic attacks. (Tr. 195). Plaintiff reported that she had been

---

[3] GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 F. App'x. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.

10

on Ativan but had quit taking it over a year ago. *Id*. The records do not indicate that plaintiff

reported her recent prescriptions for Ativan, Lamictal and Seroquel. (Tr. 195). She was

diagnosed with anxiety and mild depression, prescribed Ativan and referred to therapy for her

anxiety. (Tr. 196).

In October of 2006, plaintiff again sought treatment at Fort Hamilton Hospital for anxiety

(Tr. 188-90). Plaintiff reported that she had previously taken Ativan for anxiety, but had not had

any medication for the last year. (Tr. 188). Joseph Mooney, M.D., noted that he recommended

Klonopin for the anxiety, but expressed concern that plaintiff was less than truthful as she stated

she had not been on medication for a year but her medical history indicated she had been taking

Ativan as recently as a few months ago. (Tr. 189).

In November of 2006, plaintiff once more sought treatment at the Fort Hamilton Hospital

emergency room reporting depression and suicidal ideation and admitted to drinking seven beers

that evening. (Tr. 182). Plaintiff reported that she had seen a therapist for depression, but had

not had a session for about a year. (Tr. 182). Plaintiff denied use of street drugs and stated that

she had run out of her Klonopin prescription approximately 20 days earlier. *Id*. Jerry Kripal,

M.D., noted that plaintiff was depressed and intoxicated. (Tr. 184).

On December 9, 2006, plaintiff went to the Middletown Regional Hospital for anxiety,

difficulty breathing, and heart palpitations. (Tr. 274-76). She denied having a depressive

disorder and reported that Valium had alleviated her symptoms in past treatment. (Tr. 274). She

stated that she was on no medications. (Tr. 275). Her mental status was reported as within

11

normal limits, having appropriate affect, cooperative attitude, logical thought content, and intact judgment. *Id*. She was diagnosed with acute anxiety and panic disorder, given a prescription of Valium and discharged. (Tr. 276).

In January of 2007, plaintiff was again treated at Middletown Regional Hospital for complaints of chest pain. (Tr. 266). She was diagnosed with atypical chest pain and anxiety, and given a prescription for Ativan. (Tr. 268).

On February 20, 2007, Catherine Staskavich, Psy.D., examined plaintiff and completed a Mental Functional Capacity Assessment, Form JFS 07308 pursuant to a public assistance determination as required by Ohio Revised Code § 5101:1-5-20(B)(2)(b). (Tr. 254-55). Dr. Staskavich noted that plaintiff was markedly limited in her abilities to understand work related procedures and make decisions, to interact with the public or get along with co-workers, and to respond to changes in work settings. (Tr. 254). She further noted that plaintiff was extremely limited in her abilities to: understand and carry out instructions, maintain concentration, perform scheduled activities, sustain an ordinary routine, complete a normal workday and workweek without interruption, and accept instructions and respond to criticisms. *Id*. Dr. Staskavich opined that plaintiff was not employable and that her limitations were expected to last 12 months or more. (Tr. 255). Dr. Staskavich noted plaintiff's report that when she takes Ativan or Klonopin she does not have panic attacks. (Tr. 325).

In March of 2007, Kenneth E. Tepe, M.D., examined plaintiff after a referral from a hospital. He reported that plaintiff has a history of anxiety and that the plaintiff states she has been successfully treated with Klonopin for panic attacks. (Tr. 256-57). Dr. Tepe noted that

12

plaintiff affirmed her alcohol abuse significantly interferes with her treatment for panic disorder. (Tr. 256). Dr. Tepe diagnosed plaintiff with panic attacks and, in his assessment, noted, "There isn't any question that the patient has panic attacks, and that these are significant and need to be treated." *Id*. Dr. Tepe directed plaintiff to follow up with treatment for alcohol abuse and started her on Klonopin for anxiety. *Id*.

On April 15, 2007, plaintiff went to the emergency room at Middletown Regional Hospital with complaints of anxiety. (Tr. 259). Plaintiff reported that she had a psychiatric appointment in two weeks, and was given Ativan and a prescription for Xanax. (Tr. 260).

On April 26, 2007, E. Brengle, Ph.D., of Transitional Living completed an adult diagnostic assessment of plaintiff pursuant to a referral by Dr. Tepe. (Tr. 283-94). Dr. Brengle noted that plaintiff was currently taking Klonopin, and noted that plaintiff reported three psychiatric hospitalizations, and that the latter two involved suicidal thoughts and alcohol abuse. (Tr. 285). Plaintiff stated she had racing thoughts and difficulty remembering things and sleeping. (Tr. 287). On mental status examinations, plaintiff presented with a logical thought process, was cooperative, though mildly agitated, and reported no cognitive impairments. (Tr. 291). She also presented with a moderately depressed, anxious, angry, and irritable mood, a mildly hostile demeanor, a mildly constricted and labile affect, and a hostile demeanor. *Id*. In his narrative summary, Dr. Brengle reported, "This is a 33 year old woman. She has recurring depression, anxiety and panic, and alcoholism. She has lost custody of all 6 of her children. She cannot keep a job due to anger and conflict with others. I explained we are not able to provide psychiatric services at this time due to a lack of a second psychiatrist." (Tr. 289). Dr. Brengle

13

assigned plaintiff a GAF of 35 and diagnosed her with major depressive disorder, panic disorder, alcohol dependence and personality disorder. (Tr. 289).

Reviewing state agency psychologist, Patricia Semmelman, Ph.D., drafted a June 6, 2007 RFC assessment. (Tr. 296-99). Dr. Semmelman found plaintiff moderately limited in her abilities to maintain concentration, understand and carry out detailed instructions, to complete a normal workweek and to appropriately respond to work-setting changes and interact with the public. (Tr. 296-97). She noted that plaintiff appeared less than credible due to several inconsistencies in plaintiff's reports regarding her mental state, drug abuse and personal history. (Tr. 298). Dr. Semmelman opined that plaintiff's frequent anxiety attacks may be caused by her on and off again use of benzodiazepines. *Id.*

On June 13, 2007, plaintiff visited the emergency room complaining of a panic attack and toothache. (Tr. 391). She reported that she had run out of Klonopin. *Id.* She was given 20 Klonopin and discharged. (Tr. 392). Then, on June 22, 2007, plaintiff went to the emergency room complaining of anxiety and reported that she had stopped taking Ativan two weeks ago. (Tr. 386). She was diagnosed with panic attack, given a prescription for Ativan, and discharged. (Tr. 387).

On January 1, 2008, plaintiff went to the emergency room complaining of anxiety and restlessness and reported that she was weaning herself off her prescription for Klonopin. (Tr. 363). She reported occasional alcohol use. *Id.* She was diagnosed with Klonopin withdrawal and given a short term prescription with instructions on tapering off. (Tr. 363). Plaintiff also went to the Forensic and Mental Health Center ("FMHC") in January of 2008. (Tr. 418-22).

14

She completed an initial psychiatric evaluation with Dr. Renner and was reported as having no cognitive impairment, having good insight and a logical thought process, and was assigned a GAF of 60. (Tr. 420-21). She was diagnosed with a generalized anxiety disorder and a history of major depression. (Tr. 421). Plaintiff continued to receive counseling in February and March at FMHC. (Tr. 422-30). On February 29, 2008, plaintiff reported that she no longer wished to pursue her disability claim and felt she was able to work. (Tr. 428).

In March of 2008, plaintiff went to the emergency room complaining of anxiety and reported that she was weaning herself off her prescription for Valium. (Tr. 360). She diagnosed with anxiety, was given a refill of Ativan and discharged. (Tr. 361).

In December of 2008, plaintiff went to FMHC relating anxiety and fearfulness. (Tr. 405). She reported no prior hospitalizations (Tr. 407) and was diagnosed with major depressive disorder and alcohol dependence and was assigned a GAF of 55. (Tr. 411-12). She was noted as being attentive during her assessment, including having proper concentration and responses regarding questioning and having good insight. (Tr. 415).

On May 30, 2009, plaintiff underwent a psychiatric evaluation at FMHC. (Tr. 400-02). She reported being depressed, nervous, and anxious most of the time with frequent panic attacks. (Tr. 400). She denied alcohol use and reported that she was currently taking Valium. *Id.* On mental status examination, plaintiff was noted as having fair insight and judgment, her thought process was logical and her behavior was cooperative. (Tr. 401). She was impaired in her concentration but not her memory. *Id.* Her mood was depressed and anxious and her affect constricted. *Id.* She exhibited signs of loss of interest, anhedonia, and withdrawal. *Id.* She was

15

reported to be doing well on her medication regime and plaintiff affirmed she understood and agreed with the information about her medication. (Tr. 404). She was started on Celexa and directed to finish her Valium prescription, after which she would transfer to Xanax. (Tr. 402). She reported having approximately 60 Valium pills at that time. *Id*.

On June 16, 2009, plaintiff went to the emergency room complaining of anxiety and reported that she had run out of Valium. (Tr. 328-37). Plaintiff was noted as having normal affect, judgment, mood, and memory within normal limits; plaintiff reported that she occasionally used alcohol. (Tr. 329-32). Plaintiff was noted as being questionably reliable. (Tr. 334). She was diagnosed with anxiety and given Valium and was assigned a GAF score of 45. (Tr. 336).

On July 7, 2009, plaintiff was seen at FMHC and presented with sleeplessness and reported she had run out of medication. (Tr. 395). Plaintiff stated that Celexa was helping her mood swings, but not her anxiety; her depression was noted as being four out of ten, down from ten out of ten. *Id*.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that, at the time of the hearing, she had a regular treating psychiatrist. (Tr. 22). Plaintiff reported that she was currently prescribed citalopram for depression and diazepam for anxiety. (Tr. 30). Plaintiff testified that she has daily panic attacks which can last anywhere from 15 minutes to four hours. (Tr. 32). Plaintiff further testified that she has had these attacks for years and that during an attack she becomes dizzy and sweaty and her heart races. (Tr. 31-2). Plaintiff stated that she had crying spells at

16

least twice a day and had thoughts of suicide. (Tr. 34). Plaintiff testified that she complies with her medications and that she has been to the emergency room a lot for depression and anxiety issues even when she is taking her medication. (Tr. 33).

Plaintiff testified that she has trouble eating and sleeping, and difficulty with concentration and memory. (Tr. 33). Plaintiff acknowledged that her alcohol use had interfered with previous jobs, but reported that she had stopped using alcohol in 2007 and did not use any illicit drugs. (Tr. 35-6). Plaintiff stated that she could lift about 20 pounds, stand for approximately two hours and walk about an hour, after which her feet would begin to hurt and swell. (Tr. 31). Plaintiff testified that she did some light housework and grocery shopping, but that she did not drive and had no hobbies or recreational activities. (Tr. 37).

She testified that she had recently attempted to hurt herself and that the police had taken her to Fort Hamilton Hospital in December of 2008. (Tr. 34).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE to consider an individual who is limited to standing and or walking for six hours in an eight hour workday, frequently lifting or carrying 10 pounds, and occasionally lifting or carrying 20 pounds, who can only occasionally stoop, kneel, crouch, and climb ramps and stairs with no crawling or climbing of ladders, ropes, or scaffolds or working at unprotected heights. Further, the individual can only remember and carry out short and simple instructions, cannot interact with the general public or interact more than occasionally with coworkers or supervisors, cannot work at a rapid production rate pace or at a job with strict production quotas and the job does not require more than routine changes in setting or duties or

17

more than simple work related decisions. (Tr. 45-6). Based on this hypothetical, the VE testified

that such an individual could perform jobs such as machine tender, laundry aid, gluer, and

envelope sealing machine operator, which he classified as light, unskilled jobs. (Tr. 46)

## OPINION

Plaintiff assigns three errors in this case: (1) the ALJ usurped the role of a medical expert

and rendered an improper medical opinion; (2) the ALJ improperly evaluated the medical

evidence; and (3) the evidence in the record supports a disability finding while the opposing

evidence lacks substance. For the following reasons, the Court finds the instant matter should be

remanded in order for the ALJ to address and resolve issues related to plaintiff's medication and

treatment compliance.

## I.     The ALJ failed to properly address plaintiff's history of treatment noncompliance in light of her severe mental impairments.

Plaintiff argues that the ALJ improperly acted as his own medical expert, in violation of

20 CFR § 404.1513(a), when he made the following statements: (1) "[i]t seems clear from the

records that the claimant mainly has difficulty when she is out of medications or using alcohol;"

(2) "[t]he claimant testified she is compliant with medications. Clearly, that is not the case;" and

(3) "[w]hen compliant with treatment and medications, the claimant functions quite well." (Doc.

11, pp. 6-7). Plaintiff contends that these three statements equate to a medical opinion,

unsupported by the medical evidence, that plaintiff "would be all right if she stopped drinking

and took her medicine as prescribed." *Id*. at 10. Plaintiff asserts that noncompliance with her

18

medication regimen is a symptom of her mental impairments which the ALJ failed to address in determining her functionality. (Doc. 13, p. 3).

Defendant, in opposition, asserts that the above statements are not improper medical opinions, but are permissible evaluations of the medical record which demonstrates a correlation between plaintiff's panic attacks and her running out of medication. (Doc. 12, p. 13). Further, defendant assert that the ALJ was correct to note the correlation between plaintiff's increased functionality and medication compliance, as it supports his determination that plaintiff is not disabled. *Id.* (citing *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984) (holding an impairment that is controlled with medication is not disabling)).

In his discussion of plaintiff's compliance with medication, the ALJ stated:

> It seems clear from the records that the claimant mainly has difficulty when she is out of medications or using alcohol. In June 2005, she presented to the emergency room with a panic attack and reported being out of Ativan for 6 or 7 days. When hospitalized in May 2006, it was noted that she had not been on any medications for at least one year. In June 2006, she told emergency room physicians that she had been off medications for some time. During another emergency room visit in June 2006, she reported being out of Valium. In July 2006, she told emergency room physicians that she was on Ativan one year ago, but quit. In September 2006, she told emergency room physicians that she was on no medications. In October 2006, she presented to the emergency room for anxiety. She reported being on no medications for one year. However it was noted that she had been prescribed Ativan through emergency room visits during the summer. . . . On June 13, 2007, she presented to the emergency room with panic attacks after being out of Klonopin. On June 23, 2007, she returned to the emergency room with multiple symptoms reportedly being off Ativan for two weeks. In November 2007, she told emergency room physicians that she was out of medications. She required emergency room treatment in January

19

> 2008 after stopping Klonopin.  In March 2008, she presented to the emergency room with an exacerbation of anxiety, because she had stopped taking her Valium.  In November 2008, she reported that she stopped her Valium one week ago. . . . The claimant apparently stopped medications again, because in May 2009, she was restarted on her medications.  However, when she returned in July 2009, she was again out of medications.  The claimant testified that she is compliant with medications.  Clearly that is not the case. . . . When compliant with treatment and medications, the claimant functions quite well.

(Tr. 13-14).  The ALJ goes on to list several instances where the medical records support his opinion that plaintiff functions well when compliant with treatment and medications as noted by various findings that the plaintiff was alert, able to concentrate, and at a high functioning level. (Tr. 14).  Notably, there is no medical *opinion* relied upon by the ALJ that draws a correlation between plaintiff's compliance and her level of functionality.  After a short discussion devoted to his determination to give greater weight to agency evaluator Dr. Semmelman's opinion than to the opinion of Dr. Staskavich, the ALJ "[c]onsidering the evidence as a whole" announces his RFC determination that plaintiff is capable of substantial gainful activity with certain limitations.

Given the ALJ's extensive discussion of plaintiff's history of medication noncompliance, it appears that he gave it considerable weight in determining that she was not disabled. Generally, it is proper to base a finding of no disability on a claimant's lack of compliance with treatment.  In fact, in order to get benefits, claimants "must follow treatment prescribed by physician[s] if this treatment can restore [their] ability to work."  20 C.F.R. § 416.930(a).  If a claimant does "not follow the prescribed treatment *without a good reason*, [the ALJ] will not find [her] disabled[.]"  20 C.F.R. § 416.930(b) (emphasis added).

20

Here, the plaintiff was found to have the "following severe mental impairments: an affective disorder, an anxiety disorder, a borderline personality disorder, and alcohol dependence." (Tr. 11). "For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)). "[F]ederal courts have recognized that a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without justifiable excuse." *Pate-Fires*, 564 F.3d at 945 (internal quotations omitted) (and numerous cases cited therein).

The ALJ erred by determining that plaintiff was noncompliant with her treatment and medication without addressing whether her noncompliance was a result of one of her severe mental impairments. In fact, the ALJ declined to elicit any information from plaintiff at the hearing regarding her reasons for not taking her medication, let alone determine whether she was justified by good cause. *See* 20 C.F.R. § 416.930(b). In fact, when plaintiff testified that she had been on a variety of "depression medicines on and off over the past five years, to which I couldn't take because I had a bad reaction to a lot of them[,]" the ALJ did not follow up with this line of questioning and, rather abruptly, began questioning plaintiff about her physical abilities. (Tr. 30).

However, the ALJ later revisited plaintiff's compliance issues as follows:

ALJ: You take your medications the way you're supposed to?
Plaintiff: Yes, I do.

21

> ALJ: Because you got a lot of emergency room visits when you appear to
> be out of medications.
> Plaintiff: I've been to the – yeah, I've been to the emergency room a lot
> for thinking – even while on my medications.

(Tr. 33). There was no further inquiry by the ALJ regarding plaintiff's compliance with

medications or treatment or plaintiff's claims that she has significant symptoms despite taking

medication as prescribed. However, in his disability determination the ALJ relied heavily on this

short exchange in determining that plaintiff's testimony was not credible. (Tr. 14) ("The

claimant testified that she is compliant with medications. Clearly that is not the case."). In cases

such as this, where the plaintiff's mental impairment may, itself, be the cause of her failure to

take medication as prescribed, it is improper to use the noncompliance as a basis for faulting

plaintiff. *See Blankenship v. Bowen*, 874 F.2d 116, 1124 (6th Cir. 1989) (questioning the

practice of censuring claimants with mental impairments for exercising poor judgment in not

seeking treatment).

Social Security Ruling 82-59 further instructs that, when a claimant is not complying

with prescribed treatment, they "should be given an opportunity to fully express the specific

reason(s) for not following the prescribed treatment. Detailed questioning may be needed to

identify and clarify the essential factors of refusal. The record must reflect as clearly and

accurately as possible the [claimant's] reason(s) for failing to follow the prescribed treatment.

Individuals should be asked to describe whether they understand the nature of the treatment. . .

[and] should be encouraged to express in their own words why the recommended treatment has

not been followed." SSR 82-59, 1982 WL 31384, *2 (1982).

As discussed above, the ALJ did not seek this information at the hearing. However, plaintiff's unsolicited testimony was that she could not take many of the prescribed medications because she had negative reactions to them. (Tr. 30). This testimony is supported by the medical record. In June 2005, plaintiff reported that she had been cycling through different medications and that they provided more side effects than help. (Tr. 225). This is confirmed by her prior May 2005 emergency room visit where she complained of side effects subsequent to taking Lexapro and her report to Dr. Tepe that she stopped several medications due to side effects. (Tr. 228, 256). During her October 2006 emergency room visit, plaintiff stated that she was unable to afford medication. (Tr. 188). The record identifies two instances of plaintiff seeking emergency treatment after she purposefully weaned herself off medication, indicating that she consciously discontinued treatment but no explanation is provided. (Tr. 360, 363). In 2008, she reported that she stopped taking Valium because she thought she did not need it and did not want to be on it anymore. (Tr. 347). In 2009, she reported that she was not taking medication because her insurance had lapsed. (Tr. 331).

In light of these various statements, "the ALJ should have questioned [p]laintiff in more detail with the goal of identifying and clarifying 'the essential factors of refusal.' Without such questioning, the record – and in turn, the ALJ's Decision - fails to 'reflect as clearly and accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment' as required by Ruling 82-59." *Franklin v. Astrue*, No. 3:09cv242, 2010 WL 2667388, *9 (S.D. Ohio June 10, 2010) (quoting SSR 82-59, 1982 WL 31384, *2). Further, as identified by

23

plaintiff, there is no medical opinion[4] supporting the ALJ's inference that prescribed medication is the missing link between plaintiff's mental impairment and her being able to engage in substantial gainful activity.

There is an argument to be made that, as the ALJ did not specify that plaintiff's noncompliance precluded a finding of disability, the discussion of plaintiff's pattern of noncompliance pertained only to the credibility determination. Were that the case, the Court would be unable to find the same fault with the instant determination.[5] However, the ALJ did not sufficiently delineate between his credibility finding and his RFC determination such that the Court may dismiss the ALJ's error in deference to his credibility determination. Rather, the ALJ inextricably intertwined his discussion of plaintiff's history of noncompliance with his determination that plaintiff functioned well on medication and was, accordingly, not disabled. As such, it was incumbent upon the ALJ to further develop the record allowing plaintiff to state her reasons for not taking medication as prescribed. SSR 82-59, 1982 WL 31384, *2.

Accordingly, the Court finds plaintiff's first assignment of error well-taken and recommends that the matter be remanded to the ALJ for further consideration consistent with this Report.

---

[4] While the record does indicate that plaintiff's visits to emergency rooms coincide with her running out of medication and, further, plaintiff has reported that she has had good results treating her panic attacks with medication, there is no medical opinion in the record that addresses this issue or affirmatively states that plaintiff's impairments can be controlled with medication.

[5] It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted)

**II.      The ALJ did not err in his decision to not give controlling weight to one-time examining doctors.**

Plaintiff's second assignment of error is that the ALJ improperly evaluated the medical

opinion evidence.  Specifically, plaintiff argues that the ALJ did not give sufficient weight to the

opinions of her examining doctors[6], Dr. Staskavich, Dr. Pisarska, Dr. Tepe, or Dr. Brengle, while

giving too much weight to the state agency reviewing psychologist[7], Dr. Semmelman.  Plaintiff

concedes that these doctors were not treating physicians, but nevertheless argues that the ALJ

should have given their opinions, specifically the opinion of Dr. Staskavich, greater weight than

Dr. Semmelman's pursuant to 20 CFR § 416.927(d)(1) which provides that, as a general rule, the

ALJ "give[s] more weight to the opinion of a source who has examined you than to the opinion

of a source who has not examined you."  Defendant asserts that the opinions of plaintiff's

doctors were not entitled to special deference due to the nature of their treatment relationship; the

ALJ properly evaluated the medical evidence; and his decision to adopt Dr. Semmelman's

opinion is supported by substantial evidence.

Section 416.902 lays out the three types of acceptable medical sources upon which an

ALJ may rely on: treating source, nontreating source, and nonexamining source.  20 CFR §

416.902.  When treating sources offer opinions, the Social Security Administration is to give

such opinions the most weight and is procedurally required to "give good reason in [its] notice of

determination or decision for the weight [it gives the claimant's] treating source's opinion."

---

[6] These examining doctors have examined the plaintiff but do not have ongoing treatment relationships with her. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

[7] The reviewing psychologist has not examined plaintiff but has provided a medical opinion based on a review of plaintiff's medical records. *See* 20 C.F.R. § 416.902.

25

*Smith v. Comm'r of Soc. Sec.*, 482 F.3d at 875.  This requirement only applies to treating sources. *Id*. at 876.  "With regard to nontreating, but examining, sources, the agency will simply generally give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined [her]."  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1)) (internal citations omitted).

Here, plaintiff argues that Dr. Staskavich, Dr. Pisarska, Dr. Tepe, and Dr. Brengle, should have been given more weight, as examining sources, than was afforded by the ALJ.  As an initial matter, the Court notes that because none of these doctors were treating sources, their opinions are not entitled to any special deference.  *See* 20 C.F.R. § 416.927(d)(2); *Kornecky v. Commissioner*, 167 F. App'x 496, 506-507, 2006 WL 305648, *9 (6th Cir. 2006) ("a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship") (citing *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005); *Cunningham v. Shalala,* 880 F. Supp. 537, 551 (N.D. Ill. 1995)).  *See also Crawford v. Commissioner*, 363 F.3d 1155, 1160 (11th Cir. 2004); *Duyck v. Chater*, 907 F. Supp. 338, 342  (D. Oregon 1995). Further, Dr. Staskavich's cursory opinion that plaintiff is "[n]ot employable" (Tr. 325) is entitled to no deference because it is the prerogative of the ALJ, and not plaintiff's doctor, to make a disability determination.  *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Warner v. Comm'r*, 375 F.3d 387, 390 (6th Cir. 2004).

To determine how much weight to give to the medical source statements in the record[8], the ALJ is to consider "factors including the length and nature of the treatment relationship, the evidence that the [examiner] offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the [examiner] was practicing in her specialty." *Ealy*, 594 F.3d at 514; *see also* 20 C.F.R. § 416.927(d). The record demonstrates that the ALJ considered the relevant factors in his determination to credit the RFC opinion of Dr. Semmelman, the state agency nonexamining source, over the opinion of Dr. Staskavich. The ALJ noted that Dr. Staskavich was a one-time examiner who saw plaintiff pursuant to her application for public assistance and that her findings of extreme and marked functional limitations were inconsistent with the other evidence in the record.[9] Further, the ALJ found that Dr. Semmelman's findings of mild to moderate functional limitations were more consistent with the evidence as a whole. (Tr. 14).

Further, the ALJ considered the opinions of plaintiff's other examining doctors, Dr. Tepe and Dr. Brengle, in finding that the plaintiff had severe mental impairments. Notably, neither of these examining sources provided a substantive opinion regarding plaintiff's functional limitations. Thus, to the extent that plaintiff argues the substantive opinion of Dr. Staskavich is consistent with their findings, the consistency is limited to their diagnoses that plaintiff suffers from anxiety and/or personality disorders, and does not extend to Dr. Staskavich's findings regarding the plaintiff's functional limitations. In any event, the ALJ adopted Dr. Tepe's

---

[8] As defendant correctly notes, the only substantive opinions contained in the record regarding plaintiff's functional limitations are those of Dr. Staskavich and Dr. Semmelman.

27

diagnosis that plaintiff suffered from an anxiety disorder and alcohol dependence and Dr. Brengle's opinion that plaintiff suffered from a panic disorder, a personality disorder, and alcohol dependence. (Tr. 11). Though the ALJ did not specifically adopt Dr. Pisarska's diagnosis that plaintiff suffered from depression[10], he did rely on Dr. Pisarska's records when discussing plaintiff's medical history and her medication history. (Tr. 13).

Plaintiff also asserts that Dr. Pisarska's and Dr. Brengle's assignment of GAF scores of 35 evidences that Dr. Staskavich's opinion regarding plaintiff's limitations is consistent with the medical record.[11] The ALJ does not address the GAF scores in his disability determination, nor was he required to. "A GAF score is not dispositive of anything in and of itself[,]" *Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011), and there is no requirement that the ALJ consider GAF scores in making their RFC determinations. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d, 235, 241 (6th Cir. 2002). Here, plaintiff was assigned five GAF scores in five years as follows: 35 (Dr. Pisarska, Tr. 178), 35 (Dr. Brengle, Tr. 289), 45 (Tr. 336), 55 (Tr. 412), and 60 (Tr. 421). The GAF scores were assigned by examining sources based on one-time examinations and are not so numerous that they indicate any impairment in and of themselves. *Cf., Pate-Fires* 564 F.3d at 944-45 (finding that ALJ's failure to discuss extensive history of GAF scores - 21 scores assigned in four years and only four above 50 - was erroneous as they indicated serious impairments in social functioning).

---

[9] No other medical source opined that plaintiff is unemployable or extremely limited in her functional abilities.

[10] Plaintiff does not argue that the ALJ's erred in his findings regarding her severe mental impairments.

[11] Dr. Staskavich did not assign a GAF score to the plaintiff.

The ALJ is the ultimate decision-maker regarding plaintiff's RFC and is to take into consideration the opinions of medical sources and other relevant evidence. *See* 20 C.F.R. §§ 416.927(c), 416.945. In this case, the ALJ was faced with inconsistent and contradictory evidence. On one hand, in February of 2007, Dr. Staskavich opined that plaintiff was moderately limited in her ability to understand, remember, and carry out short, simple instructions and to maintain socially appropriate behavior, but was markedly to extremely limited in all other abilities and was not employable. (Tr. 323-25). On the other hand, two months later Dr. Brengle found that plaintiff had a logical thought process and reported no cognitive impairments. (Tr. 291). In 2008, Dr. Renner performed a psychiatric evaluation of plaintiff and noted that she had good insight and logical thought processes and no cognitive impairments (Tr. 420-21) and shortly thereafter plaintiff reported to counselors that she felt able to work. (Tr. 428). Further, agency reviewer Dr. Semmelman assessed plaintiff's RFC and found that her memory was intact, her concentration and attention was no worse than moderately impaired, and that she was able to cope with ordinary and routine changes in a work setting that is not fast paced or of high demand. (Tr. 298).

In determining plaintiff's RFC, the ALJ took into consideration the record as a whole, and determined that Dr. Staskavich's opinion was inconsistent. The ALJ acknowledged that plaintiff did have some functional limitations and limited her to work where she would be required to remember and carry out only short instructions, not interact with the general public or interact more than occasionally with coworkers or supervisors, and make only simple work-related decisions. Further, the ALJ limited her RFC to working at jobs that do not have more

than ordinary and routine changes in setting or duties and that do not have a rapid production-rate pace or strict production quotas. (Tr. 15). It is the ALJ's function to resolve inconsistencies and conflicts in the medical evidence, *see King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984), and the record reveals that the ALJ properly considered the totality of the evidence in the record in assessing plaintiff's RFC.

The ALJ's finding lays out his rationale for affording little weight to Dr. Staskavich. The ALJ cites the doctor's short-term examining relationship with plaintiff and the inconsistencies between her report and the other medical records, including the only other substantive opinion of Dr. Semmelman. This weight determination complies with the requirements of 20 C.F.R. § 416.927(d).

Lastly, plaintiff argues that the ALJ's RFC determination lacks sufficient specificity and violates the principle enunciated in *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) that administrative determinations must clearly disclose the grounds upon which the decision is based. Further, plaintiff cites to *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) in which the Seventh Circuit held that boilerplate language similar to that used by the ALJ in determining plaintiff's RFC (Tr. 13) was not sufficiently detailed to provide the reviewing court with the grounds upon which the RFC determination was based.

However, the ALJs in the *Parker* case "failed to mention highly pertinent evidence [and/or] fail[ed] to build a logical bridge between the facts of the case and the outcome." *Id.* at 921. Their determinations were overturned, not for the use of boilerplate language, but because, in addition, the decisions were fundamentally flawed as one ALJ failed to properly consider the

30

cumulative effects of impairments and the other completely ignored pertinent evidence contained in a treating physician's notes. *Id.* at 923-25. These blatant deficiencies are not present in the instant determination. Rather, the only similarity between the RFC findings of the instant ALJ and those in the *Parker* case appears to be the use of similar, boilerplate, language. Where, as in the instant matter, such boilerplate language is accompanied by a detailed basis for an RFC determination, a sufficient record exists upon which this Court can determine whether or not the ALJ's determination is supported by substantial evidence.

Accordingly, the Court declines to find the ALJ's weight determination regarding plaintiff's examining sources was erroneous.

**III.    Conclusion**

In light of the foregoing, the Court declines to reach plaintiff's final assignment of error, that the evidence in the record supports a disability finding while the opposing evidence lacks substance. Without evidence in the record regarding whether plaintiff's severe mental impairments are the cause of, and thus a justification for, her apparent non-compliance with medical treatment and mediations the Court should not make a ruling as to whether the clear weight of the evidence supports a ruling for disability. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

Therefore, this matter should be remanded for further proceedings and the taking of additional evidence. A remand should include a determination of whether plaintiff's noncompliance with treatment and/or medication is a symptom of one or more of her severe

31

mental impairments.  On remand, the ALJ should: (1) address and resolve this issue as required

by the rules, regulations and procedures of the Social Security Administration and case law; (2)

evaluate plaintiff's credibility and the medical source opinions of record under the applicable

legal criteria; and (3) review the evidence under the required five-step sequential evaluation

procedure to determine whether plaintiff was under a disability and thus eligible for SSI.

*Franklin*, 2010 WL 2667388, *11.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner by **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: __4/4/2011__

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BARBARA J. RENNEKER,                            Case No. 1:10-cv-386
    Plaintiff                               Beckwith, J.
                                        Litkovitz, M.J.

    vs

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

    Defendant

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

33